UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHELLE BOND,<br><br>      Defendant. | **SEALED INDICTMENT**<br><br>*Damian Williams* (signature)<br><br>24 Cr.<br><br>**24CRIM 494** |

### Overview

1. MICHELLE BOND, the defendant, and her romantic partner ("CC-1") illegally funded BOND's campaign for the U.S. House of Representatives in 2022. In particular, CC-1—then a high-level executive at a now-defunct cryptocurrency exchange (the "Exchange")—arranged for a sham $400,000 payment from the Exchange to BOND, which BOND then used almost entirely to fund her campaign illegally. Further, between June and August 2022, CC-1 wired hundreds of thousands of dollars to BOND's personal bank account, which BOND then used to fund her campaign illegally. BOND and CC-1's conduct violated federal campaign finance laws prohibiting corporate contributions, excessive contributions by an individual, and conduit (or straw) contributions. BOND attempted to conceal her and CC-1's conduct by, among other things, making false statements to a congressional committee and the Federal Election Commission ("FEC"), and lying to her then-employer.

### The Defendant and Co-Conspirator-1

2. MICHELLE BOND, the defendant, is an attorney based in or near Washington, D.C. At all times relevant to this Indictment, BOND worked as the chief executive officer ("CEO") for a digital assets trade group (the "Trade Group").

3.  At all times relevant to this Indictment, CC-1 worked as an executive of the Exchange. In particular, CC-1 was the CEO of a subsidiary of the Exchange based in the Bahamas (the "Subsidiary").

### BOND Launches Her Congressional Campaign

4.  MICHELLE BOND, the defendant, and CC-1 met in or about June 2021. By in or about early 2022, BOND and CC-1 were in a romantic relationship. During that time, BOND, with CC-1's support, began considering a run for political office.

5.  On or about February 3, 2022, CC-1 paid $3,000 to a political consulting firm ("Consulting Firm-1") on behalf of MICHELLE BOND, the defendant. That same day, BOND and CC-1 exchanged the following messages:

> BOND: hi I just wanted to say thank you so much for paying that [Consulting Firm-1] invoice…really appreciate this, means a lot 🙏
> CC-1: if you're thanking me for that
> CC-1: the expenses on you actually running
> CC-1: going to get me so much love <3
> ***
> BOND: you're going to get the love regardless ❤ so might as well save the 💰

6.  In late May 2022, MICHELLE BOND, the defendant, decided to launch a campaign to run for the U.S. House of Representatives. BOND then hired another political consulting firm ("Consulting Firm-2") to manage her congressional campaign (the "BOND Campaign" or the "Campaign"), including a treasurer to handle the Campaign's finances and FEC filings. During certain conversations with Campaign personnel, BOND was advised, in sum and substance, that she could self-fund the Campaign but that the funds needed to be her own.

7.  On or about May 31, 2022, MICHELLE BOND, the defendant, filed an FEC Form 2 Statement of Candidacy, declaring her intention to run for the U.S. House of Representatives in

New York's first congressional district, which comprises the eastern portion of Long Island. The "Michelle Bond for Congress Committee" filed its statement of organization the same day.

8. On or about May 31, 2022, MICHELLE BOND, the defendant, made a $47,425 payment to a firm ("Vendor-1") that was responsible for collecting signatures needed for BOND's inclusion on the ballot from her personal bank account (the "BOND Personal Account").

### BOND Receives the Sham Exchange Payment

9. On or about May 27, 2022, at the instruction of CC-1, an Exchange employee based in the Bahamas (the "Exchange Employee") began preparing a consulting agreement between the Subsidiary and MICHELLE BOND, the defendant.

10. In messages exchanged between CC-1 and the Exchange Employee, CC-1 stated, in part, that CC-1 wanted the consulting agreement for MICHELLE BOND, the defendant, to provide "flat 500,000 USD for services rendered and invoices effective today if possible[.]" The Exchange Employee then asked if "it would just be easier to have them on our payroll for base monthly pay and then submit invoices for additional expenses [] [j]ust so payment isn't delayed." CC-1 responded, "ok that makes sense, lets do 100k a year then with a signing bonus of 400k?"

11. Approximately a few hours later, the Exchange Employee asked CC-1 to whom MICHELLE BOND, the defendant, would report under the contract, and CC-1 replied, "Me!"

12. On or about May 27, 2022, CC-1, on behalf of the Subsidiary, and MICHELLE BOND, the defendant, signed an "[Exchange] Professional Services Agreement," effective May 26, 2022 (the "Consulting Agreement"). The Consulting Agreement included a $400,000 sign-on bonus "that will be paid on the first payroll cycle following the Start Date," as well as an annual payment of $100,000. BOND did not perform any services for the Exchange pursuant to the Consulting Agreement.

13. On or about June 1, 2022, the Subsidiary sent a $400,000 wire transfer (the "Exchange Payment") to the BOND Personal Account from an overseas bank account that was routed through a correspondent bank account located in Manhattan, New York, notwithstanding that BOND had not performed any services in exchange for the Exchange Payment pursuant to the Consulting Agreement. Before the Exchange Payment was deposited, there was less than $27,000 in the BOND Personal Account.

### BOND Uses the Exchange Payment for Her Campaign

14. From on or about June 1, 2022—when the $400,000 Exchange Payment was deposited into the BOND Personal Account—through on or about June 21, 2022, the BOND Personal Account sent a total of at least approximately $388,075 to Vendor-1 and a bank account established for the BOND Campaign (the "BOND Campaign Account"). Without the Exchange Payment, there would not have been sufficient funds in the BOND Personal Account to make those payments and contributions.

15. Specifically, on or about June 1, 2022, approximately four hours after receiving the $400,000 payment from the Subsidiary, the BOND Personal Account transferred $25,000 to Vendor-1.

16. On or about June 6, 2022, the BOND Personal Account sent another $63,075 to Vendor-1. On or about the same day, MICHELLE BOND, the defendant, sent a screenshot of the wire receipt to CC-1, who replied, "Want to wire 100k to campaign as well?" BOND then asked for the wire instructions and CC-1 replied, "Not a huge deal can do 25k chunks."

17. On or about June 21, 2022, the BOND Personal Account wired $300,000 to the BOND Campaign Account. In a group text including MICHELLE BOND, the defendant, CC-1, and Consulting Firm-2 employees, CC-1 provided BOND the wire instructions and BOND texted, "$300k wired!" The BOND Campaign falsely reported the $300,000 wire on her campaign's FEC

Form 3 as a loan from BOND to the Campaign, when, in truth and fact, the $300,000 at issue was an illegal contribution from the Exchange to the Campaign. The FEC Form 3 did not disclose the Exchange Payment.

### CC-1 Makes the First Payment to BOND

18. On or about June 28, 2022, CC-1 wired $313,544 to the BOND Personal Account from a bank account located in Manhattan, New York. Prior to receiving the wire, the balance in the BOND Personal Account was less than approximately $20,000.

19. On or about June 29, 2022, the BOND Personal Account wired $300,000 to the BOND Campaign Account in two separate wires ($100,000 and $200,000). That same day, the following text messages were exchanged between MICHELLE BOND, the defendant, and CC-1, with members of the BOND Campaign on the text chain:

> CC-1: I can't see into campaign account, did 100k land today?
>
> BOND: I wired $100k (the max online) at about 7pm last night and was told it would hit today. I just went into the branch and wired another $200k. Can you guys monitor to make sure this $300k clears?

20. On or about June 27, 2022, the day before CC-1 wired money to the BOND Personal Account, CC-1 asked a friend to donate to the BOND Campaign. CC-1 stated, "the whole thing is annoying cause you can only max donate $5,800 per person otherwise I would just cover the whole thing." The friend replied, "Lol if you venmo me I'll donate it." CC-1 responded, "lol don't type that, that's not allowed."

21. The BOND Campaign falsely reported the June 29, 2022 wires on an FEC Form 3 as loans from MICHELLE BOND, the defendant, to the Campaign, when, in truth and fact, the funds at issue were illegal campaign contributions from CC-1. The FEC Form 3 did not disclose CC-1's June 28, 2022 payment to BOND.

### BOND Lies on the House Ethics Committee's Financial Disclosure Form

22. As part of her candidacy, MICHELLE BOND, the defendant, was required to file a financial disclosure form with the House Ethics Committee (the "House Ethics Form"). On or about August 1, 2022, the House Ethics Form was submitted electronically through the House Ethics Committee's website.

23. The House Ethics Form indicated that MICHELLE BOND, the defendant, had digitally certified that the statements in the form were "true, complete, and correct to the best of my knowledge and belief." The House Ethics Form, which covered the period from January 1, 2021 through July 30, 2022, falsely characterized the $400,000 Exchange Payment as consulting income from the Subsidiary earned by BOND in 2021 and 2022. This characterization was inconsistent with the other false cover story that BOND and CC-1 concocted by executing the Consulting Agreement, which stated that the Exchange Payment was a "sign-on bonus."

24. On or about August 3, 2022, a crypto-focused news publication published a story entitled "Crypto booster Michelle Bond is running for Congress – with help from her [Exchange] exec boyfriend" (the "Article"). The Article noted, among other things, that MICHELLE BOND, the defendant, had reported on the House Ethics Form that she had been paid $400,000 in consulting fees from the Exchange for 2021 and 2022.

25. On or about August 4, 2022, MICHELLE BOND, the defendant, exchanged messages about the Article with a public relations consultant (the "PR Consultant") who had worked for BOND and the Trade Group. Contrary to what BOND had certified in the House Ethics Form, BOND admitted to the PR Consultant, in part, "I'm not a consultant for [the Exchange]. . . [i]t's a mess." On or about the same day, BOND also messaged CC-1 that, in response to questions

from another employee of the Trade Group about the Article, "I just said I'm not a consultant for [the Exchange]."

### CC-1 Makes Another Payment to BOND

26. In or about July 2022, MICHELLE BOND, the defendant, and CC-1 exchanged text messages relating to fundraising for the Campaign. In those messages, CC-1 stated, in sum and substance, that CC-1 would give BOND money to cover the Campaign's debt if BOND lost the race.

27. The primary election for the congressional race in which MICHELLE BOND, the defendant, was running occurred on or about August 23, 2022. BOND lost the primary and the BOND Campaign had unpaid expenses.

28. On or about August 31, 2022, CC-1 wired approximately $215,000 to the BOND Personal Account from a bank account located in Manhattan, New York. On or about September 7 and 8, 2022, the BOND Personal Account wired approximately $180,000 in two separate wires to the BOND Campaign Account. On or about September 12, 2022, the BOND Personal Account then sent a wire to the BOND Campaign Account of approximately $34,231.

29. The BOND Campaign falsely reported the September 2022 wires on an FEC Form 3 as loans from MICHELLE BOND, the defendant, to the Campaign, when, in truth and fact, the funds at issue were illegal campaign contributions from CC-1. The FEC Form 3 did not disclose CC-1's payment to BOND on or about August 31, 2022.

30. The BOND Campaign reported a total of approximately $1,014,540 in loans and contributions from MICHELLE BOND, the defendant, to the Campaign from on or about May 31, 2022 through on or about September 12, 2022. During that same period, BOND received approximately $928,544 from CC-1 and the Subsidiary.

### BOND Gives Contradictory Explanations for the Exchange Payment

31. In or about September 2022, the Trade Group undertook a review of the performance of MICHELLE BOND, the defendant, as CEO of the Trade Group. The Trade Group scheduled a meeting with BOND to discuss, among other things, the Exchange Payment.

32. On or about September 28, 2022, MICHELLE BOND, the defendant, prepared a document entitled "[Trade Group] Strategic Direction Word Document," which contained talking points related to the Trade Group's review of BOND's performance. With respect to the Exchange Payment, the document stated, "I do not work for [the Exchange] . . . Also I asked for an amendment to the FEC filing that was misreported. [The Exchange] did give $ towards my campaign and they have given [the Trade Group] $."

33. On or about that same day, MICHELLE BOND, the defendant, met with the Trade Group's board of directors (the "Board") to discuss her campaign and her future at the Trade Group. At the end of the meeting, BOND denied that she had ever worked for the Exchange and claimed that the House Ethics Form was misreported.

34. In or about November 2022, the PR Consultant reached out to MICHELLE BOND, the defendant, regarding press inquiries about BOND's connections to the Exchange. In a series of messages between BOND and the PR Consultant, BOND sent multiple versions of a proposed response to those press inquiries, all of which admitted that she had never consulted for the Exchange.

35. In light of the representation by MICHELLE BOND, the defendant, to the Board regarding the House Ethics Form, the Board continued to ask BOND questions regarding the Exchange Payment. In response to those questions, BOND and her counsel provided the Board with contradictory and false explanations for the Exchange Payment. Among other

misrepresentations, BOND, through counsel, falsely claimed, in sum and substance, that the House Ethics Form was accurate, and that BOND had previously disclosed the Consulting Agreement to the Board.

41.     MICHELLE BOND, the defendant, and her counsel agreed to speak with the Board about the Exchange Payment on or about December 23, 2022. Approximately one hour before the scheduled call, BOND submitted her resignation as CEO of the Trade Group, effective immediately. The call to discuss the Exchange Payment did not take place.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Cause Unlawful Political Contributions)

The Grand Jury charges:

42.     The allegations contained in paragraphs 1 through 41 of this Indictment are repeated and realleged as if fully set forth herein.

43.     From at least in or about February 2022 through in or about December 2022, in the Southern District of New York, and elsewhere, MICHELLE BOND, the defendant, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit: (i) knowingly and willfully causing and accepting excessive campaign contributions aggregating to $25,000 or more during a calendar year, in violation of Title 52, United States Code, Sections 30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i); (ii) knowingly and willfully causing and accepting an unlawful corporate contribution aggregating to $25,000 or more during a calendar year, in violation of Title 52, United States Code, Sections 30118(a) and 30109(d)(1)(A)(i); and (iii) knowingly and willfully causing and receiving conduit contributions aggregating to $25,000 or more during a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i).

44. It was a part and object of the conspiracy that MICHELLE BOND, the defendant, and others known and unknown, would and did knowingly and willfully cause contributions to a candidate for federal office and accept contributions as a candidate for federal office in excess of the limits set by the Election Act, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i).

45. It was a further part and object of the conspiracy that MICHELLE BOND, the defendant, and others known and unknown, would and did knowingly and willfully cause a contribution by a corporation to a candidate for federal office and accept a contribution by a corporation as a candidate for federal office, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30118(a) and 30109(d)(1)(A)(i).

46. It was further part and an object of the conspiracy that MICHELLE BOND, the defendant, and others known and unknown, would and did knowingly and willfully serve as a conduit for contributions to a candidate for federal office, and accept contributions as a candidate for federal office, in the name of another person, aggregating to $25,000 and more in a calendar year, in violation of Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i).

## Overt Acts

47. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about June 1, 2022, MICHELLE BOND, the defendant, then a candidate for federal office, received $400,000 from the Subsidiary, which payment was routed through an account located in the Southern District of New York, and from on or about June 1,

2022 through on or about June 21, 2022, BOND sent approximately $388,075 to the BOND Campaign, which she falsely reported to the FEC as contributions and loans from BOND.

    b.  On or about June 28, 2022, BOND, then a candidate for federal office, received $313,544 from CC-1, which payment was sent from the Southern District of New York, and on or about June 29, 2022, BOND sent approximately $300,000 to the BOND Campaign, which she falsely reported to the FEC as a personal loan from BOND.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Causing and Accepting Excessive Campaign Contributions)

The Grand Jury further charges:

48. The allegations contained in paragraphs 1 through 41 in this Indictment are repeated and realleged as though fully set forth herein.

49. From in or about June 2022 through in or about October 2022, in the Southern District of New York and elsewhere, MICHELLE BOND, the defendant, knowingly and willfully caused, and while a candidate for federal office, knowingly and willfully accepted and received, contributions from CC-1, in excess of the limits set by the Election Act, aggregating to $25,000 and more during the 2022 calendar year, to wit, BOND caused CC-1 to transfer $528,544 to BOND and accepted those payments, out of which BOND then sent approximately $515,000 to the BOND Campaign and falsely reported to the FEC that those funds were personal loans.

(Title 52, United States Code, Sections 30116(a)(1)(A), 30116(f) and 30109(d)(1)(A)(i);
Title 18, United States Code, Section 2.)

## COUNT THREE
(Causing and Receiving an Unlawful Corporate Contribution)

The Grand Jury further charges:

50. The allegations contained in paragraphs 1 through 41 in this Indictment are repeated and realleged as though fully set forth herein.

51. From in or about May 2022 through in or about June 2022, in the Southern District of New York and elsewhere, MICHELLE BOND, the defendant, knowingly and willfully caused a corporation to make a contribution to a candidate for federal office and, as a candidate for federal office, knowingly and willfully accepted a contribution from a corporation, aggregating to $25,000 and more during the 2022 calendar year, to wit, BOND caused the Subsidiary to make a $400,000 payment to BOND and accepted that payment, out of which BOND then sent approximately $388,075 to the BOND Campaign and falsely reported to the FEC that those funds were personal contributions and loans from BOND.

(Title 52, United States Code, Sections 30118(a) and 30109(d)(1)(A)(i);
and Title 18, United States Code, Section 2.)

## COUNT FOUR
(Causing and Receiving a Conduit Contribution)

The Grand Jury further charges:

52. The allegations contained in paragraphs 1 through 41 in this Indictment are repeated and realleged as though fully set forth herein.

53. From in or about May 2022, up to and including in or about December 2022, in the Southern District of New York and elsewhere, MICHELLE BOND, the defendant, knowingly and willfully caused contributions to be made to a candidate for federal office in the name of another person, and, as a candidate for federal office, knowingly and willfully accepted contributions made in the name of another person, aggregating to $25,000 and more during the 2022 calendar year, to

wit, BOND caused the BOND Campaign to falsely report that BOND made contributions to the BOND Campaign of approximately $928,544 that were, in truth and fact, conduit contributions made by the Subsidiary and CC-1 to the BOND Campaign through BOND.

(Title 52, United States Code, Sections 30122 and 30109(d)(1)(A)(i); and Title 18, United States Code, Section 2.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney