**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHELLE BOND,

          Defendant.

Docket No. 1:24-cr-000494-GBD

**Memorandum of Law in Support of Defendant Michelle Bond's Motion to Dismiss, to**
**Suppress Evidence, for a Hearing, and for Dismissal of Count Four of the Indictment**

## Table of Contents

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...........................................................................................2

    A.    Ms. Bond's Congressional Campaign. ................................................ 4

    B.    The government induces Mr. Salame to plead guilty in exchange for
        dropping the investigation into Ms. Bond. .......................................... 5

    C.    The Indictment and Mr. Salame's Post-Conviction Petition. ......................... 9

ARGUMENT ..........................................................................................10

I.    The Indictment Should be Dismissed for Failure to Comply with Mr.
    Salame's Plea Agreement. ....................................................................10

    A.    The government induced a guilty plea from Mr. Salame based on a
        promise outside the four corners of the agreement which should be
        enforced. .......................................................................... 10

    B.    Ms. Bond has standing to enforce the plea agreement as a third-party
        beneficiary. ........................................................................ 12

    C.    The Court should order an evidentiary hearing to determine the
        promises made to Mr. Salame and Ms. Bond in connection with the
        plea. ............................................................................... 14

II.    Statements by Ms. Bond obtained by the government between September 7,
    2023, and April 16, 2024 should be suppressed as the government led Ms.
    Bond to believe she would not be prosecuted. ................................................15

III.    Count Four Should Be Dismissed as Multiplicitous. .......................................16

CONCLUSION .......................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978)..............................................................13

*Santobello v. United States*, No. 95-CV-4404, 1998 WL 113950 (S.D.N.Y. Mar. 12, 1998) ..............................................................................................................................12

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000).............................................12

*United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK, ECF No. 1 ........................6

*United States v. Barnaby*, No. 18-CR-33 (S-2) (NGG), 2021 WL 2895648 (E.D.N.Y. July 8, 2021) .....................................................................................................................17

*United States v. CFW Const. Co., Inc.*, 583 F. Supp. 197 (D.S.C. 84)...................11-12

*United States v. Chacko*, 169 F.3d 140 (2d Cir. 1999) ..................................................16

*United States v. Clements*, 992 F.2d 417 (2d Cir. 1993) ...............................................13

*United States v. El-Sadig*, 133 F. Supp. 2d 600 (N.D. Ohio 2001) ..............................13

*United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019) .........................................11-12

*United States v. Kourani*, 6 F.4th 345 (2d Cir. 2021) ...................................................15

*United States v. Lawlor*, 168 F.3d 633 (2d Cir. 1999)...................................................11

*United States v. Podde*, 105 F.3d 813 (2d Cir. 1997) ...................................................11

*United States v. Polizzi*, 257 F.R.D. 33 (E.D.N.Y. 2009)........................................16-17

*United States v. Reed*, 639 F.2d 896 (2d. Cir. 1981) ....................................................17

*United States v. Seng Chen Yong*, 926 F.3d 582 (9th Cir. 2019)...................................14

*United States v. Smallwood*, No. 3:09-CR-249-D(07), 2011 WL 2784434 (N.D. Tex. July 15, 2011) ...................................................................................................................16

*United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008) ...............................................15

*United States v. White*, 366 F.3d 291 (4th Cir. 2004)............................................11, 15

*Wright v. U. PO*, No. 10-CV-5127 (MKB), 2021 WL 2779451 (E.D.N.Y. July 2, 2021)............12

**Statutes**

18 U.S.C. § 2 ................................................................................................................. 9-10

52 U.S.C. § 30122 ......................................................................................................... 9-10

52 U.S.C. § 30116(a)(1)(A) ...............................................................................................9

52 U.S.C. § 30116(f) ...........................................................................................................9

 52 U.S.C. § 30109(d)(1)(A)(i) ...........................................................................................9

52 U.S.C. § 30118(a) ...........................................................................................................9

**Other Authorities**

Jesse Hamilton, "Crypto Booster Bond Loses Primary Bid for New York Congressional
    Seat," CoinDesk.com ..................................................................................................5

Stephanie Murray, "Crypto booster Michelle Bond is running for Congress – with help
    from her FTX exec boyfriend," The Block, Aug. 3, 2022 .........................................4

PR Newswire, "ADAM Board and Membership Expand as Digital Asset Market Integrity
    Standards Drive Conversations in Washington," Feb. 17, 2022..................................3

Max Zahn, "A timeline of cryptocurrency exchange FTX's historic collapse,"
    ABCNews.com, Mar. 28, 2024......................................................................................5

Defendant Michelle Bond submits the following memorandum of law in support of her motions for dismissal of the indictment, to suppress evidence, for a hearing, and for dismissal of Count Four of the Indictment.

## PRELIMINARY STATEMENT

Ms. Bond came to this position solely because of the government's relentless pursuit of her husband, Ryan Salame, the only Republican-leaning executive at the bankrupt cryptocurrency exchange FTX. The government agrees that Mr. Salame had no knowledge of the fraud at FTX. The government secured a plea bargain from Mr. Salame, however, by stealth and deception – based upon the express promise that Ms. Bond, Mr. Salame's pregnant fiancée, now his wife, would not be prosecuted for alleged campaign finance violations if he pleaded guilty.

In response to the promise, Ms. Bond and Mr. Salame believed it was in their interest to not go through the public embarrassment, the toll on Ms. Bond's career, and the drain on the family's financial resources if she too was in the position of having to defend a case targeted against her. This promise is the reason Mr. Salame agreed to plead guilty. And to be sure, Mr. Salame paid a high price. As a result of his plea, he received the second-highest sentence of the five indicted executives; only Mr. Bankman-Fried received a higher sentence.

For her part, Ms. Bond understood that the government's investigation was over. Ms. Bond and her attorneys ceased all investigation and attempts to preserve potentially helpful evidence related to the investigation. Ms. Bond freely spoke on the record in support of her husband and in connection with child custody proceedings. The government did not advise Ms. Bond that it was actively investigating her. To the contrary, the assurance that was provided to her was that the government was not and would not be investigating her.

The government cannot use its overwhelming bargaining advantage to coerce a plea agreement and then fail to live up to its terms. It cannot mislead a defendant into believing there is no active investigation in the hopes of obtaining statements of the defendant that it can use later to his or her detriment. The government may not so cavalierly disregard its obligations to deal with defendants with the utmost fairness. It must strive to do justice first; "winning" or accumulating newsworthy scalps comes second.

Ms. Bond moves the Court for an order dismissing the Indictment or for an evidentiary hearing further exploring the government's failure to uphold its obligations under Mr. Salame's plea agreement that Ms. Bond would not be prosecuted. Ms. Bond also moves for an order suppressing statements made to law enforcement officers in connection with a surety interview and in testimony in her family law action; Ms. Bond never would have proceeded with the interview or testimony if there were an active investigation. Finally, Ms. Bond moves to dismiss Count Four of the Indictment as multiplicitous.

The government did not deal with Ms. Bond or her husband in good faith or with utmost fairness. It did the opposite. It is for this Court now to uphold those standards and vindicate her right to due process.

## **BACKGROUND**

Ms. Bond is a forty-five-year-old mother of three and a leading advocate for cryptocurrency markets.[1] Prior to 2018, Ms. Bond held a series of high-profile jobs in public and private practice. (Declaration of Eric R. Breslin ("Breslin Decl."), Ex. A, ¶¶ 4-8 (Mar. 26, 2025, Declaration of Michelle Bond). In 2018, after practicing law at Hogan Lovells and WilmerHale

---

[1] Ms. Bond also has a law degree and is an attorney licensed in Maryland, but she has not practiced law for many years and should, for purposes of this case, be considered a layperson.

and serving as senior counsel at the U.S. Securities and Exchange Commission, Ms. Bond took over as the head of government relations for a blockchain-based financial services company. (*Id.*).  In March 2019, she began a three-year tenure as a board advisor for Securrency, a leading developer of digital asset infrastructure.  (*Id.*).  During this time, Ms. Bond also worked as a consultant in the industry, focusing on regulatory consulting as well as product development and business initiatives.  (*Id.* at ¶ 10).

In September of 2020, the Association for Digital Asset Markets ("ADAM") appointed Ms. Bond as its Chief Executive Officer.  Catholic Law School, "Catholic Law Alumna Michelle Bond '07 Appointed CEO of the Association for Digital Asset Markets," Oct. 30, 2020 (last visited May 6, 2025).[2]  ADAM was a cryptocurrency industry organization focused on setting standards for the burgeoning digital asset marketplace.  PR Newswire, "ADAM Board and Membership Expand as Digital Asset Market Integrity Standards Drive Conversations in Washington," Feb. 17, 2022.[3]  As part of her work with ADAM, Ms. Bond came into frequent contact with FTX, a cryptocurrency exchange created and run by Sam Bankman-Fried.  (Breslin Decl., Ex. A, ¶ 8).

Simultaneously, Ms. Bond continued to do independent consulting work.  From about February 2021 up through the date FTX collapsed in November 2022, Ms. Bond performed extensive consulting services for FTX.  Her work included connecting FTX with state, federal, and international leaders who were exploring ways to address the growing cryptocurrency markets and the need for uniform regulation in the space.  Ms. Bond also wrote speeches,

---

[2] Available at https://www.law.edu/news-and-events/2020/10/2020-1029-alum-news-bond-ceo.html

[3] Available at https://www.prnewswire.com/news-releases/adam-board-and-membership-expand-as-digital-asset-market-integrity-standards-drive-conversations-in-washington-301485097.html

attended conferences representing FTX, and helped secure speakers for FTX events. (Breslin Decl., Ex. A, ¶ 10).

Ms. Bond met Ryan Salame in the course of her work with FTX. (*Id.* at ¶ 11). When Ms. Bond met first Mr. Salame, he was the Chief Executive Officer of FTX Digital Asset Markets, a Bahamian subsidiary of FTX. (*See* Sentencing Submission, *United States v. Salame*, No. 1:22-cr-000673-LAK, ECF No. 433, p. 9 (May 14, 2024)). At the time, Ms. Bond had been separated from her husband for years and was fighting a bruising divorce and custody battle. (*Id.* at ¶ 11-12). Ms. Bond and Mr. Salame formed a near immediate connection. By early 2022, they were a committed couple and planning a life together. (*See id.*).

A.    **Ms. Bond's Congressional Campaign.**

In 2022, redistricting in New York opened a seat up in the First Congressional District on Long Island, New York. Ms. Bond, having dedicated 15 years to politics, with a strong background in working on financial policy for the government, and believing the digital assets industry needed an experienced voice in Congress, decided to run for the seat. On May 31, 2022, Ms. Bond filed a statement of candidacy with the Federal Election Commission. (Breslin Decl., Ex. B (USAO_00000001)). Ms. Bond ran on an "America First" platform in the Republican primary. *See* Stephanie Murray, "Crypto booster Michelle Bond is running for Congress – with help from her FTX exec boyfriend," The Block, Aug. 3, 2022.[4]

Neither Ms. Bond nor Mr. Salame had any experience running political campaigns. So, Ms. Bond hired professionals to assist with her campaign, including in campaign finance and campaign finance compliance. Ms. Bond received advice from these professionals that she could

---

[4] Available at https://www.theblock.co/post/160714/crypto-booster-michelle-bond-is-running-for-congress-with-help-from-her-ftx-exec-boyfriend

loan funds to her campaign, making it essential that she liquidate as much of her holdings as she could manage, quickly.  Unfortunately, much of Ms. Bond's wealth was still tied up in her pending divorce.  Ms. Bond borrowed what she could against her illiquid wealth and gathered all of her liquid funds.

In what her campaign consultants dubbed as the shortest campaign they had ever worked on, Ms. Bond both began and lost the primary in summer 2022, running a *campaign that was less than 8 weeks long.  See* Jesse Hamilton, "Crypto Booster Bond Loses Primary Bid for New York Congressional Seat," CoinDesk.com, Aug. 23, 2022.[5]  It is this short, unsuccessful campaign that the government now turns from mole hill to mountain, alleging supposed campaign finance violations.

The spring and summer of 2022 took a severe toll on Ms. Bond's emotional and physical health.  In addition to the campaign, Ms. Bond and Mr. Salame purchased and moved into their new home, and Ms. Bond miscarried her and Mr. Salame's child (Ms. Bond's third).  Their lives were unsettled, to say the least, particularly Ms. Bond's career since she had lost the primary.  Ms. Bond and Mr. Salame thus shifted to focusing on building their family and home.

## B.    The government induces Mr. Salame to plead guilty in exchange for dropping the investigation into Ms. Bond.

On November 2, 2022, the crypto industry news magazine Coindesk published a story exposing the interconnected finances of FTX and Alameda Research.  *See* Max Zahn, "A timeline of cryptocurrency exchange FTX's historic collapse," ABCNews.com, Mar. 28, 2024.[6]

---

[5] Available at https://finance.yahoo.com/news/crypto-booster-bond-loses-primary-025215565.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbVS8&guce_referrer_sig=AQAAAIqGjVkVtMylxxKfFQvQvzoIpJ59BppEp6UbQ8jjSdxx7qfE57EaOv6-3kZvvA92rySq6U5dahXShnoqwrAi-57qlV9spZXXtayCHPzxpl67YHwK3w9RfONAV14LoojUlmAcjulE6V-2VXgPXIrSKUpsxgvug3wJ62jGEuALDUXm

[6] https://abcnews.go.com/Business/timeline-cryptocurrency-exchange-ftxs-historic-collapse/story?id=93337035

The article started a downward collapse at FTX. *Id.* In those early days in November 2022, Mr. Salame first began to learn of the financial irregularities at FTX. Indictments soon followed. On December 9, 2022, the court unsealed an indictment against Sam Bankman-Fried, the founder and owner of FTX and Alameda Research. *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK, ECF No. 1. Additional indictments followed on December 19, 2022 (Zixiao (Gary) Wang and Caroline Ellison) and February 28, 2023 (Nishad Singh). *Id.* at ECF Nos. 7, 9, 91.

Meanwhile, Ms. Bond and Mr. Salame became aware that the government was investigating Mr. Salame. They cooperated fully with government document requests, including providing full images of both their cell phones and their laptops. (*See* Breslin Decl., Ex. C (April 27, 2024 email containing notes of the government's call with Mayer Brown, prior defense counsel).

On April 27, 2023, the government arrived early in the morning at Mr. Salame and Ms. Bond's home, bearing a search warrant for Ms. Bond and Mr. Salame's cell phones. Agents banged on the door, guns drawn, with a battering ram.

That same day, in an effort to strike fear into Mr. Salame and Ms. Bond, prosecutors convened a telephone call with Ms. Bond's and Mr. Salame's attorneys (they were jointly represented), in which the government for the first time discussed possible charges against Ms. Bond. (*See id.*). Defense and government attorneys had a further video call the following day, April 28, 2023, during which the government informed the attorneys that if Mr. Salame pled guilty to charges, any investigation into Ms. Bond would be dropped. (*Id.*). The government's own notes from that meeting reflect the following exchange:

> **DS [AUSA Danielle Sassoon]**: One question for you, which we didn't want to raise before the search. MB's status has shifted. Any

information you can share about your continued representation with her?

**JL [Jason Linder, attorney for Mr. Salame and Ms. Bond]**: Still digesting, but would like an opportunity to engage in a dialogue with SDNY about MB. Is it just the transactions in June?

**AR [AUSA Andrew Rohrbach]**: Not just in June, but through the summer.

**DS [AUSA Danielle Sassoon]**: Without making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern RS but not SBF.

(*Id.*).

Ms. Bond was not present for the meeting, but there are privileged communications that informed Ms. Bond's and Mr. Salame's understanding of the promises made by the government at this meeting. Those communications are *far more direct* than the government's vague notes and are corroborated by correspondence between her attorneys and the government.[7]

Specifically, from this and other conversations with prosecutors, Mr. Salame, Ms. Bond, and their attorneys understood from Assistant United States Attorney Danielle Sassoon that the government would be closing the investigation into Ms. Bond if Mr. Salame agreed to plead guilty. (Breslin Decl., Ex. D (June 2024 correspondence between the government and attorneys for Ms. Bond and Mr. Salame).

The government now disputes such a promise. In a filing in Mr. Salame's case, the government produced notes purporting to reflect a May 25, 2024 call "walking back" its

---

[7] As stated below, Ms. Bond is willing to waive the privilege over those communications and she understands that any waiver could well extend beyond just the communications she elects to share. Ms. Bond should be afforded the ability to understand the scope of that waiver and be informed as to exactly what the waiver will entail. This is an issue that should be worked out before any disclosure, with the input of the Court if necessary, and in connection with discovery from the government that will likely be necessary to resolve this issue. In the meantime, should the Court require a proffer of additional communications supporting the need for at least a hearing, Ms. Bond can proffer some of these communications *in camera*.

promise.  (*See* Breslin Decl., Ex. E(May 25, 2023 government notes).    Defense attorneys have no recollection of any such conversation.  (*See* Breslin Decl., Ex. D).

In September 2023, Ms. Bond was seven months pregnant.  (*See* Breslin Decl, Ex. F (USAO_00057857).  Ms. Bond's two children from her first marriage are devoted to Mr. Salame.  Neither Mr. Salame nor Ms. Bond wished to run the risk that their children would be left without a parent or that their other two children would be traumatized by the loss of both their mother and step-father.  Mr. Salame and Ms. Bond's attorneys were advised that the agreement to cease investigating Ms. Bond could not be placed within the four corners of the Salame plea or other written agreement, but the government still offered it as an inducement to induce the plea.  (Ryan Salame Declaration, *United States v. Salame*, No. 22-cr-00673, ¶ 6 (attached as Exhibit G to the Breslin Decl.) ("Salame Decl."); Breslin Decl., Exs. C, D).  Mr. Salame accepted the government's offer and pleaded guilty on September 7, 2023.  *United States v. Salame*, No. 22-cr-00673, ECF No. 262.

Ms. Bond set about the difficult task of preparing her children for the separation and for life as a single mother of three children.  Now free from the threat of indictment, she sat for a surety interview in connection with Mr. Salame's bond on September 13, 2023.  (Breslin Decl., Ex. F (USAO_00057857)).

On May 18, 2023, Ms. Bond also gave testimony in her family law action.  (*See* Breslin Decl., Ex. H).  Ms. Bond had previously taken all possible steps to avoid having to testify, at great disadvantage to her, given the active investigation.  Now, believing herself free of the investigation, Ms. Bond believed she was free to testify.  As expected, opposing counsel inquired into the circumstances of the investigation and Ms. Bond's campaign, and Ms. Bond answered.

It was to Ms. Bond and her attorneys' shock when the government reached out months later in May 2024, advising that it was winding up its investigation and implying that it was preparing to charge Ms. Bond.  (Breslin Decl., Ex. D).  The government claims to have "walked the promise back," but – again – Ms. Bond's lawyers have neither a memory of nor notes of any such "walkback".  (*See id.*).  To the contrary, Ms. Bond has privileged communications that show exactly the opposite – that the inducement was alive and mutually understood through spring of 2024.  Subject to a carefully parsed waiver, these documents and supporting testimony need to be placed before the Court. *See* Footnote 7, above.

**C.     The Indictment and Mr. Salame's Post-Conviction Petition.**

On August 19, 2024, the court unsealed an indictment against Ms. Bond alleging four counts:

> Count I:     Conspiracy to cause an unlawful political
>              contribution in violation of 52 U.S.C. § 30122 and
>              30109(d)(1)(A)(i);
>
> Count II:    Causing and accepting excessive campaign
>              contributions in violation of 52 U.S.C. §
>              30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i) and
>              18 U.S.C. § 2;
>
> Count III:   Causing and receiving an unlawful corporate
>              contribution in violation of 52 U.S.C. § 30118(a)
>              and (30109(d)(1)(A)(i) and 18 U.S.C. § 2); and
>
> Count IV:    Count IV: Causing and receiving a conduit
>              contribution in violation of 52 U.S.C. 30122 and
>              30109(d)(1)(A)(i) and 18 U.S.C. § 2

(ECF 1).

When these charges were announced, Mr. Salame filed a petition in the district court to withdraw his guilty plea.  Motion for Writ of Coram Nobis, *United States v. Salame*, No. 22-cr-000673-LAK, ECF No. 470.  Mr. Salame faced pointed questioning by the district court (ECF

No. 503) in connection with his application and based upon his impression that he would face consequences for maintaining the petition, Mr. Salame eventually withdrew his application. (*See id.* at ECF No. 494).

The issues of Mr. Salame's plea and whether the government breached its agreement remain unlitigated. The government's own notes demonstrate a promise that Ms. Bond would be spared if Mr. Salame pleaded guilty. The evidence shows no such "walk back" of that promise that was actually conveyed to counsel. The defense believes sufficient evidence exists to merit dismissal of the indictment. At a minimum, enough exists to demonstrate a legitimate factual dispute as to the nature and scope of the promises made to Mr. Salame and Ms. Bond to induce his guilty plea such that a hearing with discovery is required. The integrity of the entire process is implicated when the government makes promises to induce a plea and then refuses to honor those promises. Ms. Bond submits it is in the Court's interest, if not the Court's affirmative obligation, to investigate further.

## **ARGUMENT**

**I.    The Indictment Should be Dismissed for Failure to Comply with Mr. Salame's Plea Agreement.**

The government induced a plea agreement from Mr. Salame based upon the promise that the government would drop its investigation into Ms. Bond. Ms. Bond is thus a third-party beneficiary of the plea agreement and has standing to enforce the promise made by the government. The Court should enforce that promise and dismiss the indictment.

### **A.    The government induced a guilty plea from Mr. Salame based on a promise outside the four corners of the agreement which should be enforced.**

The government made a clear promise to Mr. Salame on which he relied in accepting the plea agreement. The Court should enforce that promise even though it was not referenced in the

plea agreement and despite the plea agreement's merger clause. The government acknowledged that its promise would not be reduced to writing, but assured that Ms. Bond would not be prosecuted. This is enough to bind the United States.

Plea agreements are typically interpreted in accordance with contract principles. *United States v. Podde*, 105 F.3d 813, 820 (2d Cir. 1997). A plea agreement, however, is "significantly different from [a] commercial contract." *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019). The government has extreme and unequal bargaining power in negotiating plea agreements and such agreements implicate constitutional rights. *United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999). Consequently, the review of a plea "is not limited to its four corners" and a plea agreement must be "strictly construed against the government." *Feldman*, 939 F.3d at 189. The government is required to act with the "highest standard of fairness," and courts should hold the prosecutors "to meticulous standards of performance." *Id*.

The Court can and should consider extrinsic or parol evidence in determining whether a promise was made, despite the existence of the merger clause. The Second Circuit employs a "relaxed" version of the parol evidence rule in connection with plea agreements. *Id.* at 190. This relaxed approach permits the Court to consider promises outside the four corners of the plea agreement even if the agreement contains a merger clause. *Id*; *see also United States v. White*, 366 F.3d 291, 295 (4th Cir. 2004) ("Proof of the Government's refusal to abide by such an oral promise would clearly constitute evidence of 'government overreaching' or 'fraud in the inducement,' admissible without running afoul of the parol evidence rule."); *United States v. CFW Const. Co., Inc.*, 583 F. Supp. 197, 203 (D.S.C. 84) (holding parole evidence could be offered in support of a motion to dismiss because "the right to have the Government's obligations under a plea bargain enforced is of constitutional dimensions."). The Court should

11

thus scrutinize the government's oral and written statements in evaluating the existence of a promise outside the plea agreement, especially where the government failed to negotiate or act in good faith. *Feldman*, 939 F.3d at 190.

### B. Ms. Bond has standing to enforce the plea agreement as a third-party beneficiary.

Once the existence of an agreement is established, the Court should find that Ms. Bond has standing to enforce the agreement as a third-party beneficiary.

Several courts considering the question of a third party's standing have found that a true third-party beneficiary can enforce a plea agreement. For example, in *United States v. CFW Const. Co., Inc.*, the District Court for the District of South Carolina, analogizing to traditional contract principles, observed that if the government promises not to prosecute a third party as part of a plea, the third party would be able to enforce the agreement. 583 F. Supp. 197, 203 (D.S.C.), *aff'd*, 749 F.2d 33 (4th Cir. 1984). In that case, the district court found that no promise had been made, but observed that, had a promise been made, the court would have been compelled to dismiss the indictment. *Id.*; *see also United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000) (suggesting in dicta that a third-party can enforce the terms of an immunity agreement or plea bargain where they are the clear third-party beneficiary of the agreement).

More recently, in the Eastern District of New York, Judge Brodie considered a third-party attempt to enforce a plea agreement. The court observed the existence of a "possible" exception to the rule that only a party can enforce a plea agreement where "a defendant enters into a plea agreement with the intent to benefit another (for instance, an agreement to plead guilty in exchange for a commitment to spare a spouse from prosecution)." *Wright v. U. PO*, No. 10-CV-5127 (MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021); *but see Santobello v. United States*, No. 95-CV-4404, 1998 WL 113950, at *3 (S.D.N.Y. Mar. 12, 1998) (noting that

"there is little known authority that would allow [the petitioner] to enforce [his codefendants' plea] agreements as a third party beneficiary").

The case of *United States v. El-Sadig*, 133 F. Supp. 2d 600 (N.D. Ohio 2001) is closely analogous. In *El-Sadig*, members of the Saudi Royal family visited the United States. *Id.* at 601. While in the United States, several members of the entourage acquired weapons illegally. *Id.* The government entered into an agreement whereby it agreed not to prosecute the individuals responsible for purchasing the guns if the guns were surrendered to the government. *Id.* The government later indicted one of the Saudi contingent's entourage. *Id.* The inducement was not specific to individuals; rather a chief of police had said that if the weapons were turned to the government the "matter would be closed." *Id.* at 604.

The court held that the defendant was an intended beneficiary, as opposed to an incidental beneficiary, of the contract and therefore had standing to enforce the agreement. *Id.* at 609. The court rejected the government's argument that the promise was ambiguous as to individuals, because the government must bear the responsibility for lack of clarity in a plea agreement. *Id.*

The cases finding third-party standing coincide with the principles surrounding the interpretation and enforcement of plea agreements. There is no question that the government can and often does leverage a given defendant's relationship with a third-party to negotiate a plea agreement. *United States v. Clements*, 992 F.2d 417, 419 (2d Cir. 1993) ("It is now clearly established in the Second Circuit that the government may impose conditions which relate to the conduct or treatment of others."). However, plea negotiations premised on the treatment of another carry a high risk of inappropriate coercive power, *Bordenkircher v. Hayes*, 434 U.S. 357,

364-65 (1978), and require "a more careful examination of voluntariness," *United States v. Seng Chen Yong*, 926 F.3d 582, 591 (9th Cir. 2019).

The government has this power and often utilizes it, but that must carry with it consequences. The government cannot leverage this powerful, coercive tool and then attempt to hide from its consequences. To hold otherwise would invite significant gamesmanship. A defendant could be induced to plead guilty, receive a sentence, and serve a majority of his sentence only to have the third-party for whose benefit he executed the plea be indicted. At that point, the defendant could challenge the plea agreement, but he has already lost nearly its full value – he has relinquished his right to a trial and served the time all for naught. No recission of the plea agreement would cure that breach.

There is no question that Ms. Bond is a third party beneficiary of the plea agreement. Mr. Salame expressly stated that concern for his pregnant fiancée was a substantial motivating factor in his accepting his plea. (Breslin Decl. Ex. G ("Salame Decl."), ¶ 12). Mr. Salame went to jail and has served nearly seven months of a prison sentence. The government now seeks to prosecute Ms. Bond, destroying nearly all the value of his plea agreement. As a third-party, Ms. Bond has standing to challenge the plea agreement. She should be permitted to do so, and the Indictment should be dismissed.

### C.    The Court should order an evidentiary hearing to determine the promises made to Mr. Salame and Ms. Bond in connection with the plea.

The Court should conduct an evidentiary hearing into the question of what was promised to Ms. Bond and Mr. Salame, when, and by whom. The defense has come forward with concrete, written evidence that Mr. Salame and Ms. Bond and their counsel were led to believe that a guilty plea by Mr. Salame would end the investigation into Ms. Bond. (*See* Breslin Decl., Exs. C, D). Ms. Bond can submit additional evidence *in camera* showing the contemporaneous

thoughts and impressions of her counsel at the time to support the need for a hearing. Ms. Bond will agree to waive the privilege, subject to defined parameters as to the breadth and scope of the waiver. Should the Court order a hearing, the defense will seek document discovery from the government. Ms. Bond will waive her privilege subject to the Court's review as to scope.

The government may claim that it rescinded the offer. (*Id.* at ¶ E). Ms. Bond's then-counsel denies any such conversation. (*Id.*) There is thus, at a minimum, a factual dispute that requires the Court's careful consideration and analysis. *See United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (holding an evidentiary hearing was required and was especially compelling where factual disputes existed, and competing declarations contradict each other).

There is sufficient evidence of a promise by the government to warrant an evidentiary hearing. Both parties need discovery into the scope of the promises made to Mr. Salame and Ms. Bond, and what was understood by the government and by Mr. Salame and Ms. Bond in September 2023. That requires a careful balancing of the privilege issues as well as the constitutional and contractual rights attendant to the plea agreement. Ms. Bond respectfully submits that a hearing with the testimony of the participants is required here before the motion is decided.

## II. Statements by Ms. Bond obtained by the government between September 7, 2023, and April 16, 2024 should be suppressed as the government led Ms. Bond to believe she would not be prosecuted.

The government may not seek to obtain evidence through fraud, trickery, or deceit by concealing the existence of a criminal investigation from the defendant. *United States v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008). A statement by a defendant will be deemed involuntary if government agents deliberately misled a defendant into making the statements. *United States v. Kourani*, 6 F.4th 345, 351–52 (2d Cir. 2021). Voluntariness is determined by evaluating the circumstances of the statement, including: "(1) the characteristics of the accused,

(2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 351-52 (quoting *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)).

The government affirmatively misled Ms. Bond as to the status of its investigation. The government promised Ms. Bond that, if Mr. Salame pleaded guilty, the investigation into Ms. Bond would be closed. When Mr. Salame pleaded guilty, Ms. Bond believed, and the government was aware of her belief, that the investigation into her was at an end. Aware that Ms. Bond believed any investigation into her was closed, several members of law enforcement attended a surety interview Ms. Bond gave on the issue of Mr. Salame's bail, took copious notes, and generated a Form 302. Believing any investigation into her campaign finance was closed, Ms. Bond also felt free to testify in her family law action.

The government should be precluded from using these statements by Ms. Bond, made while Ms. Bond was under the impression, conveyed by the government, that she was no longer under investigation. Ms. Bond now moves to suppress any statement made by her concerning the facts underlying and fact of the government's investigation into campaign violations from the date of the inducement forward.

### III.  Count Four Should Be Dismissed as Multiplicitous.

Count Four should also be dismissed as multiplicitous to the rest of the Indictment. An Indictment is multiplicitous where it charges multiple offenses in separate counts when only one crime has been allegedly committed. *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *United States v. Polizzi*, 257 F.R.D. 33, 36 (E.D.N.Y. 2009). One act can be charged as separate crimes only where each offense "'requires proof of an additional fact with the other does not.'" *United States v. Smallwood*, No. 3:09-CR-249-D(07), 2011 WL 2784434, at *6 (N.D. Tex. July 15, 2011) (quoting *United States v. Tucker*, 345 F.3d 320, 337 (5th Cir. 2009)).

16

A multiplicitous indictment carries with it the danger of prejudice at trial.  *See Polizzi*, 257 F.R.D. at 37 (discussing the danger of prejudice inherent in a multiplicitous indictment); *see also United States v. Reed*, 639 F.2d 896, 904 (2d. Cir. 1981) (noting that a multiplictious indictment may "improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes.").  Thus, counts that are multiplictious on its face should be dismissed prior to trial.  *United States v. Barnaby*, No. 18-CR-33 (S-2) (NGG), 2021 WL 2895648, at *7 (E.D.N.Y. July 8, 2021).

Count Two alleges that Ms. Bond caused or received excessive campaign contributions from Mr. Salame because Mr. Salame sent her $528,544 of which Ms. Bond sent approximately $515,000 to her campaign.  (ECF No. 2, ¶ 49).  Count Three alleges that Ms. Bond caused or received an unlawful corporate contribution by receiving $400,000 from FTX of which she sent $388,075 to her campaign and reported them as personal contributions and loans.   (ECF No. 2, ¶ 51).  Count Four alleges that Ms. Bond accepted or received a conduit campaign contribution in the amount of $948,544 – exactly the amount alleged that Ms. Bond received in Counts Two and Three.  Counts Two and Three allege that Ms. Bond received funds from Mr. Salame and FTX, respectively, which were reported by her campaign team as either loans or contributions from herself.  Count Four charges Ms. Bond with receiving funds from Mr. Salame and FTX and reporting them as "contributions" to herself.  Count Four creates multiplicity in the Indictment as the same payments are being cast and recast over and over again.

When presented with a multiplicitous indictment, the Court should require the government to elect between the charged counts.  *Polizzi*, 257 F.R.D. at 36-37 (citing *United States v. Clarridge*, 811 F. Supp. 697, 702-07 (D.D.C. 1992)).  The Court should require the

government to choose to dismiss Count Four and proceed with Counts Two and Three or dismiss Counts Two and Three and proceed with Count Four.

## CONCLUSION

The government may not play fast and loose with the rights of defendants, whether those rights inure through the sacrifice of another or directly impact the defendant. The government made a promise and acquired a plea. It has now broken that promise. The government's failure to keep its promise should result in the dismissal of the indictment, and suppression of Ms. Bond's statements. Count Four should also be dismissed because it is multiplictious and inflates the Indictment, resulting in prejudice to Ms. Bond.

Dated:  May 7, 2025
      New York, New York

**DUANE MORRIS LLP**

*/s/ Eric R. Breslin*
Eric R. Breslin, Esq.
Melissa S. Geller, Esq.
1540 Broadway
New York, New York 10036
Tel: 212-692-1000
Email: erbreslin@duanemorris.com
Email: msgeller@duanemorris.com

Stephen H. Sutro, Esq. (Admitted *Pro Hac Vice*)
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Tel: 415-957-3008
Email: shsutro@duanemorris.com

Joseph R. Welsh
30 South 17th Street
Philadelphia, PA 19103-4196
Tel: 215-979-1000
Email: JRWelsh@duanemorris.com

*Attorneys for Defendant Michelle Bond*