UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :              24 Cr. 494 (GBD)

                      - *v* -                    :

MICHELLE BOND,                               :

                            Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF THE UNITED STATES OF AMERICA IN OPPOSITION
TO MICHELLE BOND'S MOTIONS TO DISMISS AND TO SUPPRESS**

PERRY CARBONE
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515

Stephanie Simon
Assistant United States Attorney
      - Of Counsel -

**TABLE OF CONTENTS**

PRELMINARY STATEMENT.......................................................................................................1

BACKGROUND ........................................................................................................................2

   A.  Salame's Plea Agreement.............................................................................................2

   B.  The Plea Discussions with Salame's Counsel ...........................................................3

   C.  Salame's Guilty Plea Proceeding ...............................................................................6

   D.  The Investigation of Bond..........................................................................................6

   E.  Salame's Sentencing .................................................................................................7

   F.  Bond's Indictment .....................................................................................................8

   G.  Salame's *Coram Nobis* Petition ...............................................................................9

DISCUSSION ..........................................................................................................................11

   I.  Bond's Motion to Dismiss the Indictment Is Meritless ..........................................11

      A.  Bond Lacks the Right To Enforce Salame's Plea Agreement .............................11

      B.  Salame's Plea Agreement Did Not Contain a Promise Not To Prosecute Bond...14

      C.  The Motion Should Be Denied Without a Hearing  ..............................................17

   II.  Bond's Motion To Suppress Is Meritless................................................................18

      A.  Applicable Law....................................................................................................18

      B.  Discussion ...........................................................................................................19

   III.  Bond's Multiplicity Challenge Is Premature and Meritless................................22

      A.  Applicable Law....................................................................................................22

      B.  Discussion ...........................................................................................................23

CONCLUSION.........................................................................................................................25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to Michelle Bond's motions to dismiss and to suppress (Dkt. 39 ("Mot.")).

Bond's motion to dismiss the Indictment is factually and legally meritless. Bond's now-husband, Ryan Salame, pleaded guilty to multiple federal crimes before the Honorable Lewis A. Kaplan, United States District Judge, and was sentenced to 90 months' imprisonment. Following sentencing, Salame attempted to renege on his guilty plea, and to undermine the lawful prosecution of Bond for criminal campaign-finance offenses that Bond and Salame committed together, by baselessly claiming that he was induced to plead guilty by a supposed unwritten promise from the Government not to prosecute Bond. After a hearing in front of Judge Kaplan in which Salame admitted that the Government made no such binding promise to him, Salame attempted to withdraw his motion and promised not to raise claims that he was fraudulently induced to plead guilty in any other forum. Bond now attempts to recycle those abandoned claims on her own behalf, but to no avail. The Government made no promises as to Bond in connection with Salame's guilty plea. In any event, Bond has no right to enforce any promise supposedly made to Salame.

Bond's motion to suppress is similarly meritless. Bond claims that she was coerced into making incriminating statements (none of which she identifies) during her divorce proceeding and in connection with a co-signer interview for Salame's bond in his federal case, based on the supposed unwritten promise the Government made to Salame that Bond would not be prosecuted if he pleaded guilty. That claim fails because no such promise was ever made. But even accepting Bond's version of events as true, her claim would still fail, because Bond could not have been coerced into waiving her Fifth Amendment rights by the Government's supposed statements.

Bond's multiplicity challenge should also be rejected as premature.

1

# BACKGROUND

## A. Salame's Plea Agreement

On September 7, 2023, Salame pleaded guilty, pursuant to a plea agreement with the Government, to Superseding Information S7 22 Cr. 673 (LAK) (the "Information"), which was filed that same day. (Salame Dkt. 262).[1] The Information charged Salame in two counts. Count One charged Salame with conspiracy to make unlawful political contributions and defraud the Federal Election Commission, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30118, 30109, and 30122. Count Two charged Salame with conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960. (Salame Dkt. 262).

As described in the Information, Salame engaged in multiple conspiracies to advance the interests of Samuel Bankman-Fried, for whom Salame worked as a high-level executive at Alameda Research, the quantitative cryptocurrency trading firm founded by Bankman-Fried, and then FTX. (Salame Dkt. 262 ¶¶ 1-2). Specifically, between 2020 and 2022, Salame conspired to operate Alameda and its affiliates as a means for transmitting funds on behalf of FTX customers, without obtaining the required federal money transmitting licenses for Alameda and the relevant affiliates. (Salame Dkt. 262 ¶ 1). In addition, from at least 2020 through 2022, Salame conspired to violate the federal election laws by steering millions of dollars of illegal campaign contributions to candidates for elective office. (Salame Dkt. 262 ¶ 1).

In advance of Salame's plea proceeding, Salame, his attorneys, and the Government signed his plea agreement. The agreement enumerated the conduct for which Salame would not be further

---

[1] "Salame Dkt." refers to entries on the district court's docket in *United States v. Ryan Salame*, S7 22 Cr. 673 (LAK).

prosecuted criminally by the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") in consideration of his guilty plea, namely the offense conduct underlying Counts One and Two of the Information, as well as four additional categories of offenses, including "willfully making excessive political contributions to a candidate for federal office in an amount in excess of the then-applicable limitation on individual contributions, and exceeding $25,000 in the calendar year 2022, and conspiracy to do the same, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109 and 30116." (Salame Dkt. 491 Ex. 1 at 2). As described in Salame's Presentence Report, this portion of the agreement referred to unlawful excessive campaign contributions Salame made to Bond, his then-girlfriend, when she ran for Congress in the 2022 election cycle. (Salame PSR ¶¶ 33-36). There was nothing in Salame's plea agreement that suggested that USAO-SDNY would not criminally prosecute any of Salame's criminal co-conspirators in consideration of his guilty plea. The final paragraph of Salame's plea agreement contained an integration clause:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

(Salame Dkt. 491 Ex. 1 at 7).

**B. The Plea Discussions with Salame's Counsel**

Salame's guilty plea was preceded by plea discussions between Salame's attorneys and the Government over the course of several months. Among other things, in January and February

2023, Salame's attorneys made proffers to the Government about Salame's conduct, including about areas of concern specifically identified by the Government.[2]

On April 25, 2023, the Federal Bureau of Investigation ("FBI") executed judicially-authorized search warrants at Salame and Bond's residence to seize their electronic devices based on probable cause that the devices contained evidence of violations of numerous subject offenses, including making and receiving excessive campaign contributions, making contributions in the name of another person, making false reports to the Federal Election Commission, conspiracy to commit these offenses, as well as money laundering, wire fraud, and wire fraud conspiracy.

On April 28, 2023, the USAO-SDNY prosecutors who were involved in the investigation of FTX (the "FTX Prosecution Team") had a virtual meeting with Salame's attorneys (who also represented Bond at that time). (*See* Mot. Ex. C). As reflected in the Government's contemporaneous notes, the Government informed Salame's attorneys that Salame was still the subject of an active and ongoing investigation. During the meeting, the Government reviewed high-level areas where Salame had criminal exposure or where the Government had uncovered criminal conduct and noted that it expected to seek authorization to indict Salame, although the exact charges and recommendation had not been finalized. (*See* Mot. Ex. C). The Government explained that if Salame's attorneys could represent that Salame was interested in exploring a pre-indictment resolution, the Government could provide additional information about its view of the evidence. (*See* Mot. Ex. C). The Government also explained that it was investigating a variety of criminal conduct involving Salame and identified a mutual interest in reaching a disposition pre-

---

[2] At that point in time, the Government had not disclosed to Salame's attorneys the existence of its grand jury investigation of an illegal campaign finance scheme involving Bond.

indictment with a lower statutory maximum than Salame might otherwise face if indicted. (*See* Mot. Ex. C). Salame's attorneys asked why the Government had proceeded with a search warrant of Salame and Bond's residence, despite Salame's purported compliance with Government document requests. (*See* Mot. Ex. C). The Government noted that Bond's status in its investigation had shifted, and Salame's attorneys indicated that they wanted an opportunity to engage in a dialogue with the Government about Bond, who was also their client. (*See* Mot. Ex. C). At the conclusion of the meeting, the Government noted that while it was not making promises outside the four corners of any plea agreement, if the parties reached a resolution, the Government expected that such an agreement would conclude the aspects of the investigation concerning Salame, but not Bankman-Fried. (*See* Mot. Ex. C).

As reflected in contemporaneous notes, the FTX Prosecution Team had a follow-up virtual meeting with Salame's attorneys on May 25, 2023, to clarify the status of its investigation of Bond—whom Salame's attorneys also represented—and to spell out, for the avoidance of any doubt, that a Salame guilty plea would not stop any ongoing investigation of Bond's conduct. (*See* Mot. Ex. E). The Government explained that in light of the attorneys' continued representation of Bond, the Government "wanted to clarify that before continued discussions about potential disposition for Ryan [Salame]," it "view[ed] Ryan and Michelle as separate" and "resolution of his case will not bear on her case and investigation of her conduct." (Mot. Ex. E). One of Salame and Bond's attorneys responded that he "[u]nderstood," and stated, in substance, that he thought the Government had "said no promises outside plea agreement, but plea will generally resolve investigation into Ryan's conduct that doesn't involve Sam [Bankman-Fried]." (Mot. Ex. E). The Government explained that in light of that prior conversation, it "wanted to make very clear that

we view discussions of Michelle [Bond]/Ryan [Salame] as separate, a Ryan disposition will not resolve investigation of Michelle's conduct, and to extent anything previously said was understood otherwise, that is superseded by this call." (Mot. Ex. E). Salame's counsel stated that he wanted to continue the discussions about contemplated charges. (Mot. Ex. E). Soon thereafter, and after some additional discussion about the appropriate disposition, the Government transmitted the written plea agreement described above, which Salame accepted.

### C.  Salame's Guilty Plea Proceeding

On September 7, 2023, Salame appeared before Judge Kaplan for a change of plea proceeding. That proceeding complied with Federal Rule of Criminal Procedure 11. Salame was placed under oath and answered a series of questions. (Salame Dkt. 283 at 4). Asked by the Court whether "anyone offered you any inducements or threatened you or anyone else, or forced you in any way to plead guilty," Salame answered: "No, your Honor." (Salame Dkt. 283 at 18-19). The Court also asked Salame: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?" (Salame Dkt. 283 at 19). Again, Salame answered: "No, your Honor." (Salame Dkt. 283 at 19). Salame's attorneys did not interject to modify any of Salame's responses or to assert that any additional promises had been made.

### D.  The Investigation of Bond

The Government continued to investigate Bond after Salame's guilty plea, which the Government alerted Salame and Bond's attorneys to prior to Salame's sentencing. Specifically, on April 15, 2024, USAO-SDNY prosecutors who were involved in the investigation of Bond (the "Bond Prosecution Team") emailed Salame and Bond's attorneys seeking to set up a call to discuss the status of the Bond investigation. (*See* Mot. Ex. D).

The Bond Prosecution Team spoke with the attorneys representing Salame and Bond by phone on April 18, 2024. During that call, Salame and Bond's attorneys indicated that they had expected that the Government would cease investigating Bond if Salame pled guilty. In response, the Bond Prosecution Team asked about the May 25, 2023 meeting, during which the FTX Prosecution Team explicitly told Salame and Bond's attorneys that Salame's guilty plea would have no bearing on the Bond investigation. The attorneys responded that they would review their notes from that call and get back to the Government. (*See* Salame Dkt. 491 Ex. 5).

On May 20, 2024—over a month later and approximately one week before Salame's sentencing—an attorney for Salame and Bond emailed the Bond Prosecution Team to ask for a meeting with USAO-SDNY supervisors, without addressing the May 25, 2023 meeting. (*See* Mot. Ex. D). On May 21, 2024, the Bond Prosecution Team responded and asked Salame and Bond's attorneys again about the May 25, 2023 meeting, and reiterated that the Government's contemporaneous notes reflected that the FTX Prosecution Team had told Salame and Bond's attorneys that "a disposition with Mr. Salame would not resolve the investigation of Ms. Bond's conduct." (*See* Mot. Ex. D). Salame and Bond's attorneys did not respond.

**E.  Salame's Sentencing**

Salame appeared for sentencing on May 28, 2024. At no point before or during the sentencing proceeding did Salame seek to withdraw his plea or raise any issue regarding any purported promise made by the Government not to prosecute Bond, despite his and Bond's attorneys being repeatedly informed that Bond remained under investigation after Salame's guilty

plea. After hearing from the parties and from Salame himself, Judge Kaplan sentenced Salame principally to 90 months' imprisonment. (Salame Dkt. 448 at 24).

On June 11, 2024, following Salame's sentencing, the Bond Prosecution Team emailed Salame and Bond's attorneys to ask if they were still interested in making a presentation to USAO-SDNY supervisors. (*See* Mot. Ex. D). In response, Salame and Bond's attorneys asked for a meeting in July and also addressed, for the first time, the May 25, 2023 meeting, stating that their notes did not reflect that a disposition with Salame would not resolve the investigation of Bond. (*See* Mot. Ex. D). Later, at a July 30, 2024 meeting between Salame and Bond's attorneys, the Bond Prosecution Team, and USAO-SDNY supervisors, Salame and Bond's attorneys repeated this claim. (*See* Salame Dkt. 491 Ex. 6). However, Salame and Bond's attorneys did not share any contemporaneous notes they may have had from the May 2023 meeting, nor does Bond attach any such documents to her motion.

### F.  Bond's Indictment

On August 19, 2024, a grand jury returned Indictment 22 Cr. 494 (GBD) (the "Indictment") charging Bond with (1) conspiracy to cause unlawful political contributions, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109, 30116, 30118, and 30122; (2) causing and accepting excessive campaign contributions, in violation of 52 U.S.C. §§ 30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i), and 18 U.S.C. § 2; (3) causing and receiving an unlawful corporate contribution, in violation of 52 U.S.C. §§ 30118(a) and 30109(d)(1)(A)(i), and 18 U.S.C. § 2; and (4) causing and receiving a conduit contribution, in violation of 52 U.S.C. §§ 30122, 30109(d)(1)(A)(i), and 18 U.S.C. § 2. (*See* Dkt. 1). As described in detail in the Indictment, those charges stemmed from Bond's conspiring to cause and causing unlawful campaign contributions

in connection with her unsuccessful run for Congress in 2022. Specifically, the Indictment alleges that Bond conspired with Salame (identified as CC-1) to obtain, and did obtain, contributions for her congressional campaign from FTX and from Salame in excess of applicable limits.

The day the grand jury returned the Indictment, the Bond Prosecution Team informed Bond's attorneys—who continued to represent Salame—that the Indictment had been returned and that the District Court had issued a summons for Bond to appear on August 21, 2024. At counsel's request, the Government agreed to move Bond's surrender date to August 22, 2024. (*See* Salame Dkt. 491 Exs. 7, 8).

### G. Salame's *Coram Nobis* Petition

On August 21, 2024, after Salame and Bond's attorneys were notified of the Indictment but before Bond's agreed-upon surrender date, Salame filed a petition for *coram nobis*, seeking "[a]n order dismissing with prejudice any indictment of Michelle Bond for the campaign-finance offenses the investigation of which was supposed [sic] be concluded by Salame's guilty plea in this case" or in the alternative "an order vacating and setting aside the judgment of conviction entered against Salame on May 28, 2024," among other things, based on the assertion that the Government had induced him to plead guilty by promising that Bond would not be prosecuted. (Salame Dkt. 470 at 26). Salame filed a sworn declaration in support of his petition, in which he claimed that the Government had represented to his lawyers in the April 2023 meeting that if he "pleaded guilty, the U.S. Attorney's office would be *unlikely* to pursue the campaign-finance charges against Bond." (Mot. Ex. G at 2 (emphasis added)). Salame's sworn declaration did not

mention the second, May 2023 meeting in which the Government clarified that the resolution of Salame's case had no bearing on the status of any investigation of Bond.

On August 29, 2024, Salame sought to withdraw his *coram nobis* petition without prejudice, asserting that because the primary relief sought is the dismissal of the Indictment, "it makes sense to adjudicate the issues raised in the Petition in the docket in which the indictment is pending." (Salame Dkt. 484 at 1). That same day, Judge Kaplan ordered that "the parties shall file the papers" and "appear for argument on September 12, 2024." (Salame Dkt. 485).

On September 12, 2024, following written briefing, the parties appeared before Judge Kaplan. At that proceeding, Judge Kaplan described Salame's sworn declaration as "in a variety of respects ambiguous and quite likely internally inconsistent" (Salame Dkt. 503 at 3-4), and then questioned Salame extensively regarding the accuracy of the assertions made in that declaration. During that colloquy, Salame claimed that he was not truthful at his change of plea proceeding when he said, under oath, that no one had "made any promises, other than whatever is set forth in the plea agreement" in order to induce him to plead guilty. (Salame Dkt. 503 at 10). However, Salame admitted that, based on communications from his lawyers following their April 2023 meeting with the Government, he understood that there was only a "likelihood" that the Government would stop investigating Bond if he pleaded guilty, which was not the same as a promise not to prosecute her, although he preferred the word "assurance." (Salame Dkt. 503 at 8-9, 15-16). Salame further admitted that, following the May 2023 meeting, the Government was "required to walk back the language slightly" regarding its supposed promise not to prosecute Bond, but that Salame failed to mention that meeting in his declaration, creating "a misleading impression." (Salame Dkt. 503 at 16-17). At the conclusion of the proceeding, Salame "request[ed]

to withdraw the petition with prejudice," meaning that he "would not assert these allegations or seek relief based upon them in any court" and "would not voluntarily testify to facts relating to this matter, unless required to do so through proper compulsory process." (Salame Dkt. 503 at 17, 20). Notwithstanding Salame's promise not to offer testimony regarding these topics, and despite the fact that Salame admitted that his sworn declaration was at a minimum "misleading," Bond relies upon that same sworn declaration in support of her motion. (*See* Mot. Ex. G).

## DISCUSSION

### I.    Bond's Motion to Dismiss the Indictment Is Meritless

Bond recycles the same false claims Salame made in his withdrawn *coram nobis* petition about the Government having promised not to prosecute her if Salame pleaded guilty in his federal case. (Mot. 5-9, 10-15). Bond's motion fails because she cannot enforce any promise made to Salame in connection with his guilty plea, and in any event the Government never made—and indeed expressly disclaimed—the promises Bond alleges.

### A.    Bond Lacks the Right To Enforce Salame's Plea Agreement

As an initial matter, Bond has no right to invoke any purported promise made to Salame in connection with his guilty plea, as Bond is not a signatory to Salame's plea agreement. *See Wright v. U. PO*, No. 10-CV-5127 (MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021) ("Non-parties to [a plea] agreement suffer no due process deprivation as a result of a breach of another defendant's plea agreement. . . . Under general contract law principles, a contract typically vests only its signatories with rights, and non-parties usually have no substantive interest in seeing the contract enforced." (internal quotation marks and citation omitted)). In an attempt to evade that default principle, Bond invokes the third-party beneficiary doctrine commonly applied to

11

commercial contracts. (Mot. 12-14). But significant authority suggests that a third-party beneficiary cannot enforce a plea agreement, which is a special kind of contract. *See United States v. Lopez*, 944 F.2d 33, 37 (1st Cir. 1991) (observing that "we are unaware of authority" supporting application of "third party beneficiary principles . . . to a plea agreement in a criminal case"); *United States v. Viju*, No. 3:15-CR-0240-B (JJB), 2016 WL 107841, at *4 (N.D. Tex. Jan. 11, 2016) (explaining that "[t]he right to enforce a plea deal does not exist for its own sake; rather, it is a means to achieve fairness in plea bargaining," and "enforcement by third parties adds nothing to protecting the defendant's right"); *Santobello v. United States*, No. 94 Cr. 119 (RPP), 1998 WL 113950, at *3 (S.D.N.Y. Mar. 12, 1998) (noting that "there is little known authority that would allow [a defendant] to enforce [his codefendants' plea] agreements as a third party beneficiary").

The only in-circuit case Bond cites, *Wright*, is not persuasive. There, the court described the third-party beneficiary doctrine as only a "*possible* exception" to the general principle that "a contract typically vests only its signatories with rights," and in support of that assertion relies on *Santobello*, where the court noted that the third-party beneficiary doctrine's application to plea agreements *lacked* support in the case law. *Wright*, 2021 WL 2779451, at *18 (emphasis added). The other cases Bond cites (Mot. 12-13) are similarly unpersuasive or factually distinguishable. In *United States v. CFW Const. Co.*, the operative plea agreement provided that the Government would "not further prosecute defendant, its subsidiary Hot Mix, Inc., *or its parent CFW Construction Company, Inc.*" for certain antitrust violations within Tennessee, and for that reason the court analyzed whether the parent CFW was a "third party beneficiary" of the agreement. 583 F. Supp. 197, 203 (D.S.C.) (emphasis added), *aff'd*, 749 F.2d 33 (4th Cir. 1984). Further, although the court applied the third-party beneficiary doctrine, it relied solely on contracts treatises for

support, and did not analyze whether that doctrine should be applied to plea agreements. *See id.*

Similarly, in *United States v. El-Sadig*, the court permitted a third party to invoke a plea agreement,

but it did not analyze or address whether third party standing rules apply to plea agreements. 133

F. Supp. 2d 600, 608-09 (N.D. Ohio 2001). And in *United States v. Andreas*, the Seventh Circuit

expressly disclaimed that it was "deciding whether third parties can ever be immunized" by an

immunity agreement entered into with another party. 216 F.3d 645, 663 (7th Cir. 2000).

In any event, even under the third-party beneficiary law on which Bond relies (Mot. 12-

14), she would have to show that "the original parties intended the [agreement] to directly benefit

[her] as [a] third part[y]." *United States v. Wilson*, 216 F.3d 645, 663 (7th Cir. 2000) (assuming

without deciding that third party could enforce immunity agreement); *see also United States v.*

*Fla. W. Int'l Airways, Inc.*, 853 F. Supp. 2d 1209, 1228 (S.D. Fla. 2012) (third party must show

that "a direct and primary object of the contracting parties was to confer a benefit on the third

party"). Bond cannot make such a showing: she is not named in Salame's plea agreement, and she

has offered no evidence—absent Salame's post-hoc, self-serving affirmations (Mot. 14)—that the

parties to Salame's plea agreement intended to confer a benefit on her. Indeed, the objective

evidence is to the contrary. The plea agreement's integration clause, which disclaims any promises

outside the plea agreement, establishes that the parties did not intend to confer benefits on anyone

other than Salame, and only intended to confer upon him the specific benefits outlined in the plea

agreement; that understanding is confirmed by Salame's sworn statement at his change of plea

proceeding that there were no promises made to him outside the plea agreement that induced him

to plead guilty. Further, Bond is asking this Court to extend the third-party beneficiary doctrine to

permit her to enforce a purported oral promise not contained (but rather expressly disclaimed) in the plea agreement. There is absolutely no support for permitting her to do so.

**B. Salame's Plea Agreement Did Not Contain a Promise Not To Prosecute Bond**

Even if Bond had the right to enforce promises made in connection with Salame's plea agreement (she does not), she would still not be entitled to relief, because the Government did not make *any* promise to Salame about the investigation and prosecution of Bond if he pleaded guilty, and certainly not any enforceable promise.

During plea negotiations, the Government made clear that it viewed Salame and Bond and the Government's investigations of each as separate, and that any disposition as to Salame would not conclude the investigation of Bond. (*See* Mot. Ex. E). This message was relayed to the attorneys who represented both Salame and Bond, and was spelled out in no uncertain terms. Specifically, and in order to prevent any possible ambiguity or unintentional misapprehension from the April 2023 meeting, the Government explained that in light of the attorneys' continued representation of Bond, the Government "wanted to clarify that before continued discussions about potential disposition for Ryan [Salame]," it wanted to "make clear that [the Government] view[s] Ryan and Michelle as separate, resolution of his case will not bear on her case and investigation of her conduct." (Mot. Ex. E). Salame and Bond's attorneys relayed that they understood, and proceeded to negotiate a final plea agreement for Salame. After Salame's guilty plea, but before his sentencing, the Government confirmed that its investigation of Bond was ongoing, but Salame did not seek to withdraw his guilty plea prior to sentencing. In her motion, Bond claims that the attorneys that represented her and Salame at the time "have no recollection of any such conversation" in May 2023 with the Government in which the Government "walk[ed] back" its

14

purported promise not to prosecute Bond if Salame pleaded guilty. (Mot. 7-8). Those same attorneys in fact acknowledged that the May 2023 meeting occurred and told the Government only that their *notes* from that meeting did not match the Government's notes (although they did not share their notes or elucidate what those notes reflect occurred during that meeting). (Mot. Ex. D). And, in the hearing before Judge Kaplan, Salame admitted that, following the May 2023 meeting, the Government had "walk[ed] back the language slightly" regarding its supposed promise not to prosecute Bond. (Salame Dkt. 503 at 16).

Bond's allegations about purported representations made by the Government are therefore demonstrably false and incomplete. But even if those accusations were accepted as true, it would not create an enforceable promise, as the plea agreement contained no promises as to Bond and explicitly stated it superseded any prior discussions and that there were no additional agreements between the parties. In light of the Government's "advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). However, a defendant who enters into a plea agreement is generally bound by the agreement's terms. *See In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999) (noting that "a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach"). Salame's plea agreement is unambiguous. It contained no assurance whatsoever that Salame's guilty plea would conclude any investigation of Salame's co-conspirators or immunize them from prosecution. Indeed, the plea agreement specified that "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties." (Salame Dkt. 491 Ex. 1 at 7). Salame, under oath at his guilty plea proceeding, confirmed that *no*

promises had been made to him other than what was contained in the plea agreement. (Salame Dkt. 283 at 19 (The Court: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?" Salame: "No, your Honor.")). That confirmation was made in the presence of his attorneys who had represented Salame in plea negotiations with the Government. Given Salame's "emphatic statement" that he understood the plea agreement and that no other promises caused him to plead guilty, "it [is] not reasonable to infer that somehow" he "was still relying" on conflicting prior representations by his counsel. *Ventura v. Meachum*, 957 F.2d 1048, 1056 (2d Cir. 1992).

Even if the Government had suggested in plea negotiations that it would cease investigating Bond if Salame pleaded guilty (it did not), the plea agreement expressly "supersede[d] any prior understandings, promises, or conditions between this Office and the defendant." (Salame Dkt. 491 Ex. 1 at 7). It is well settled that a defendant "may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach," where, as here, "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement." *Altro*, 180 F.3d at 376; *see also id.* (A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement."); *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004) (same).

Finally, Salame's behavior confirms that there was no ambiguity in the agreement, and that he understood it contained no promises as to Bond. *See, e.g.*, *United States v. Helm*, 58 F.4th 75, 83 (2d Cir. 2023) (the Second Circuit looks to the "precise terms of the plea agreements and to the parties' behavior" to determine the parties reasonable understanding of the terms of the agreement). On top of telling the Court that no promises had been made to him outside the terms

16

of the plea agreement (Salame Dkt. 283 at 19), Salame did not seek to withdraw his plea prior to sentencing. And despite confirmation before his sentencing that the investigation of Bond was ongoing, at sentencing, when he was given an opportunity to speak, he expressed remorse for his conduct and apologized to the Government, rather than accusing the Government of misconduct, a breach, or bad faith. (Salame Dkt. 448 at 15-17).

### C.  The Motion Should Be Denied Without a Hearing

The motion to dismiss should be denied without a hearing. For all the reasons set forth here, Bond has not raised a plausible claim for relief. As a matter of law, she lacks standing to enforce any purported promise made to Salame in connection with his plea agreement, so it is unnecessary to resolve any of the factual disputes raised in her motion. Further, she has not submitted contemporaneous notes her attorneys claiming that Salame was made any promises or assurances beyond those in the written agreement, and the claims contained in Salame's own sworn affidavit are not credible on their face, in light of their inconsistency with Salame's actions, the words he spoke at his guilty plea, and the Government's contemporaneous records, as Judge Kaplan noted. (Salame Dkt. 503 at 3-4). Under these circumstances, a hearing is unnecessary.

For these reasons, the Court need not conduct additional fact finding to deny Bond's motion. However, if the Court were to believe further factual development is warranted, Bond has put in issue the communications between herself, Salame, and their counsel, at least regarding the terms of his Salame's plea, and therefore waived the attorney-client privilege, as Bond appears to concede (Mot. 7, 14-15 & n.7). Thus, should the Court order a hearing, the Court should require counsel's testimony in written or oral form. *See United States v. Gallego*, 944 F. Supp. 309, 322-23 (S.D.N.Y. 1996) (by moving for a new trial based on ineffective assistance, the defendant "put

in issue" and therefore "waived" privilege, and it was appropriate to require former counsel to "prepare drafts of responsive affidavits" and later testify at a hearing).

## II.   Bond's Motion To Suppress Is Meritless

Bond seeks to suppress statements she made in May 2023, in connection with her divorce proceedings, and in September 2023, in connection with a co-signer interview, on the ground that the Government induced her to make those statements by supposedly promising not to prosecute her. (Mot. 15-16). That motion fails because the Government made no such promise, and in any event, Bond was not coerced into waiving her Fifth Amendment rights.

### A.   Applicable Law

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004). Statements are compelled if they "were not made voluntarily—that is, if the defendant's will was overborne." *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021). "[A] finding that police conduct is false, misleading, or intended to trick and cajole the defendant into confessing does not render the confession involuntary. A court must still make specific findings that under the totality of the circumstances the defendant's will was overborne by the [Government's] conduct." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018). "Those circumstances generally fall into three categories: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023).

### B.  Discussion

Bond's suppression motion is factually and legally flawed. Bond asserts that "[t]he government promised Ms. Bond that, if Mr. Salame pleaded guilty, the investigation into Ms. Bond would be closed." (Mot. 16). For the reasons explained, that claim is demonstrably false. During the April 28, 2023 meeting between lawyers for Salame and Bond and the FTX Prosecution Team, the FTX Prosecution Team explained that, although they could not promise as much in writing in the plea agreement, if the parties reached a resolution in Salame's case, the Government *expected* that such an agreement would conclude the aspects of the investigation *concerning Salame*. (*See* Mot. Ex. C (if Salame pleads guilty, "we expect that we will conclude the aspects of our investigation *that concern RS* [Salame] but not SBF [Bankman-Fried]" (emphasis added)). The Government did not make any promises to or regarding Bond whatsoever; the Government merely expressed what was likely to occur with respect to further investigation into *Salame's* other crimes.

Accordingly, when Bond testified in her divorce proceeding on May 18, 2023 (Mot. 8), she could not have reasonably "believed . . . that the investigation into her was at an end" (Mot. 16), much less that she could *never* be prosecuted. That is so, even though the May 25, 2023 meeting, during which the Government further clarified that resolution of Salame's case would have no bearing on Bond's case (*see* Mot. Ex. E), had not yet occurred. As described, the Government made no promise whatsoever with respect to Bond during the April 2023 meeting. But even assuming that Salame and Bond's lawyers wrongly understood that the FTX Prosecution Team was referring to the Bond investigation in that meeting, Bond still could not have reasonably believed that she lacked criminal exposure, because (1) the Government (even in Bond's telling) only expressed its *expectation* about what would happen if Salame pleaded guilty, and did not

19

make any sort of binding promise; and (2) at the time Bond testified in her divorce proceeding, Salame had not yet pleaded guilty, so any supposed promise from the Government had not yet been triggered. Bond's basis for believing that the Government's investigation against her was definitively concluded and that she could never be charged was even less reasonable by the time she sat for the co-signer interview in September 2023, by which time the Government had clarified that resolution of Salame's case would have no bearing on Bond's case (*see* Mot. Ex. E).

Given her continuing criminal exposure, Bond—who was represented by counsel—would have been justified in invoking the Fifth Amendment in response to any question posed to her during her divorce proceeding or during her co-signer interview that called for disclosures that Bond "reasonably believe[d] could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972). Bond's voluntary choice not to invoke her Fifth Amendment right does not make her statements compelled. *See United States v. Stringer*, 535 F.3d 929, 938 (9th Cir. 2008) (Fifth Amendment privilege "protects an individual from being *forced* to provide information" and "may be waived if it is not affirmatively invoked" (emphasis added)).

Indeed, Bond offers no support for the proposition that sworn statements to a third party (such as testimony in a divorce proceeding[3]), as opposed to statements to government actors, are subject to suppression based on the notion that "the defendant's will was overborne." *Kourani*, 6 F.4th at 351. Indeed, the cases Bond cites (Mot. 15-16) all concern suppression of statements made to government actors. *See Stringer*, 535 F.3d at 932 (evidence provided to the SEC); *Kourani*, 6 F.4th at 351 (statements to the FBI); *United States v. Haak*, 884 F.3d 400, 402 (2d Cir. 2018)

---

[3] Bond does not specify whether she testified voluntarily or in response to a subpoena.

(statements to New York police officers). Even assuming the Fifth Amendment supplies the proper mode of analysis, Bond cannot establish that her statements were involuntary. Given that Bond is an attorney with a successful career in law, politics, and government relations, her "characteristics" support a finding that her statements were voluntary. *Mendonca*, 88 F.4th at 164; *see, e.g.*, *Kourani*, 6 F.4th at 352 (finding relevant in voluntariness inquiry that defendant was an "adult who had graduated from college and who held a master's degree in business administration"); *Haak*, 884 F.3d at 414 (that defendant "is an adult" of "at least average intelligence" and was not "prone to coercion" suggest that statements were voluntary). The "conditions of interrogation" further suggest that Bond's statements were voluntary. *Mendonca*, 88 F.4th at 164. Indeed, neither Bond's testimony at her divorce proceeding nor the co-signer interview were interrogations at all. The divorce proceeding did not even involve the Government, and the co-signer interview was a telephonic interview that Bond volunteered for, for which her attorney was present, and for which Bond was notified that a USAO-SDNY prosecutor and agents from the FBI would be present (*see* Mot. Ex. F). Lastly, the Government's "conduct" did not make his disclosure involuntary. *Mendonca*, 88 F.4th at 164. There is zero evidence that the Government "affirmatively misled" Bond regarding the status of its investigation of her (Mot. 16), let alone that the Government "intended to trick and cajole [Bond] into confessing." *Haak*, 884 F.3d at 409. As explained, the Government never made any promises to Bond, and even took steps to clarify any possible ambiguity. And there is no suggestion that the Government's conduct was in any way calibrated to extract any statement from Bond whatsoever. Thus, Bond cannot establish that her "will was overborne." *Kourani*, 6 F.4th at 351; *United States v. Garcia*, 780 F. Supp. 166, 171-72 (S.D.N.Y. 1991) (rejecting "contention that [the defendant] did not testify voluntarily [due to] the

government's and Court's failure to inform him that he would be arrested after leaving the courtroom," explaining that "a finding of voluntariness does not require a finding that the defendant acted with full knowledge of the consequences of his actions").

## III.    Bond's Multiplicity Challenge Is Premature and Meritless

Bond's claim that the charges against her are multiplicitous (Mot. 16-18) is premature, as questions of multiplicity must be resolved after trial. In any event, Bond's claim lacks merit.

### A.  Applicable Law

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). The Double Jeopardy Clause of the Fifth Amendment "protects against multiple *punishments* for the same offense," but not simultaneous *prosecutions* for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (emphasis added), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). Thus, a defendant cannot be sentenced for multiplicitous charges covering the same crime. *See United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam). "If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.* For that reason, courts regularly and properly defer ruling on multiplicity motions until after trial. *See id.* (vacating district court's dismissal of count as multiplicitous prior to trial, as such a determination before trial is "at best premature").[4] Among other reasons, courts look to "the record

---

[4] *See, e.g.*, *United States v. Costanzo*, No. 22 Cr. 281 (JPO), 2023 WL 8451868, at *5 (S.D.N.Y. Dec. 6, 2023) ("[I]t is a regular practice of courts in the Second Circuit to deny pre-trial motions to dismiss potentially duplicitous or multiplicitous counts, reserving decision until after the jury

as a whole in determining whether an indictment is in fact multiplicitous," and the record is not

fully established until after trial. *United States v. McCourty*, 562 F.3d 458, 469 (2d Cir. 2009).

And because double jeopardy is meant to protect a defendant from successive punishments for the

same offense, a multiplicitous count does not violate the Double Jeopardy Clause unless and until

sentence is imposed. *See Josephberg*, 459 F.3d at 355 ("Where there has been no prior conviction

or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for

the same offense, so long as no more than one punishment is eventually imposed.").

## B.  Discussion

Bond's multiplicity challenge is, at best, premature, for multiple reasons.

*First*, the Court cannot properly conduct the multiplicity analysis before hearing all the

evidence regarding the charges in the Indictment. Prior to trial, the record will not be fully

developed, and the Court cannot conduct the necessary analysis to determine whether the counts

---

has rendered a verdict."), *appeal docketed*, No. 24-1469 (2d Cir. May 30, 2024); *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) (denying multiplicity motion and noting that "'[c]ourts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature.'" (quoting *United States v. Medina*, No. 13 Cr. 272 (PGG), 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014))); *United States v. Halkbank*, No. 15 Cr. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020) (same); *see also, e.g.*, *United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157, at *15 & n.6 (S.D.N.Y. Dec. 10, 2021) (collecting cases); *United States v. Dumitru*, No. 18 Cr. 243 (LAK), 2018 WL 3407703, at *1 (S.D.N.Y. June 26, 2018) (denying multiplicity motion in light of "the Circuit's controlling view that the question of multiplicitousness is properly considered only at a later point in the proceedings"); *United States v. Mostafa*, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) ("[M]ultiplicity is properly addressed by the trial court at the sentencing stage."); *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("Defendants' multiplicity challenge is premature. Should the jury convict Defendants on what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions." (citations omitted)); *United States v. Rivera*, No. 09 Cr. 619 (SJF), 2011 WL 1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("[T]he issue of whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at the pretrial stage.").

are in fact multiplicitous. Consistent with decisions of the Second Circuit and the routine practice in this district, the Court can and should defer conducting any multiplicity analysis until after hearing all the evidence at trial. *See Josephberg*, 459 F.3d at 355.

*Second*, the motion may become moot because it is possible that the jury could conclude that Bond is guilty of one of the charged conspiracies, but not guilty of one or more of the others. That is because each charged counts alleges that Bond agreed to violate a different criminal statute, each of which requires proof of elements that the others does not. Although the Government expects to prove beyond a reasonable doubt each of the charged counts, it is ultimately a question for the jury, which means that a motion to dismiss counts as multiplicitous is premature. Because the Government has the discretion to present to the jury independent theories of guilt on each count, it is both unnecessary and unwarranted to reach this motion now. *See Josephberg*, 459 F.3d at 355 ("It is well established that whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion, and a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution . . . ." (internal quotation marks and brackets omitted)).

Bond claims that the multiplicitous charges "carr[y] . . . the danger of prejudice at trial." (Mot. 17). Although a district court retains discretion to decide a multiplicity motion before trial where the very bringing of the allegedly multiplicitous charge is likely to have an inordinate prejudicial effect before the jury, *see United States v. Reed*, 639 F.2d 896, 904 n.6 (2d Cir. 1981), this rare circumstance is clearly not present here. Even if the Court ultimately concluded that one or more of the charges was multiplicitous with another, given the course of conduct charged in the Indictment, it would hardly be unduly prejudicial for a jury to consider four charges (as alleged in

the Indictment) instead of three charges (as Bond requests). There is certainly no prejudice extreme enough to justify deviating from the typical practice in this district, consistent with the law, of deferring the issue until it can be resolved on a full factual record after trial. *See, e.g.*, *Costanzo*, 2023 WL 8451868, at *5; *Maxwell*, 534 F. Supp. 3d at 322; *Saab*, 2021 WL 5868157, at *15 & n.6; *Halkbank*, 2020 WL 5849512, at *9; *Dumitru*, 2018 WL 3407703, at *1; *Medina*, 2014 WL 3057917, at *3; *Mostafa*, 965 F. Supp. 2d at 464; *Ghavami*, 2012 WL 2878126, at *11.

Only after the Court has heard all the evidence at trial and received the jury's verdict will Bond's motion be ripe. Accordingly, the motion should be denied as premature. But in any event, on the full record, any challenge to multiplicity will fail, including because each of the challenged counts "requires proof of a different element," *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In these circumstances, the charges are not multiplicitous, and any motion to dismiss on that basis fails. *See, e.g.*, *United States v. Hicks*, 5 F.4th 270, 275 (2d Cir. 2021) ("Because each offense contains at least one element not contained in the other, we are persuaded that the charging component of the Double Jeopardy Clause is not implicated here.").

## <u>CONCLUSION</u>

For the foregoing reasons, Bond's motions should be denied.

Dated:  New York, New York
        June 5, 2025

                                        Respectfully submitted,

                                        PERRY CARBONE
                                        Attorney for the United States, Acting under
                                        Authority Conferred by 28 U.S.C. § 515

                                By:     s/ Stephanie Simon
                                        Stephanie Simon
                                        Assistant United States Attorney
                                        (212) 637-2581